The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning, everyone. The first argued case this morning is No. 20-1303, Micron Technology, Inc. v. North Star Innovations, Inc. Ms. Bostwick, when you're ready. Thank you, Judge Newman. May it please the court, there is simply no plausible dispute that the prior art Tachibana reference discloses each of the elements of the 274 patent at issue in this appeal. Let's start with Claim 10. The claim requires that the differential amplifier has an output driven by an emitter or a source of a transistor. The 274 patent shows one transistor generating the output and providing it to another transistor where it's driven through the emitter to the level conversion circuitry. And Tachibana has that same arrangement. One transistor generates the output, it provides it to transistor 131, and the output is driven through the emitter of transistor 131 to the level conversion circuitry. The board thought it mattered that Tachibana labels that driving transistor as part of the level converter, while the patent labels it as part of the differential amplifier. But it doesn't matter. Neither North Star nor the board has offered a basis on which to impose that requirement on Claim 10. And unrebutted expert testimony shows that Tachibana's transistors work exactly the same as the ones in the 274 patent's embodiment. Well, isn't there an argument that if you read that limitation in light of the specification, then you already have a limitation which avoids Tachibana? That's their argument, Your Honor, but there's no support for that in the specification. And the board didn't identify any either. All that the specification gives are examples that include an element driving an output to another element, but there's absolutely nothing in the specification that suggests that that's limiting. On the contrary, the specification over and over states that it is describing one embodiment, one embodiment, and that alternate embodiments of the present invention can use different circuit elements. Ms. Bossbrook, this is Judge Chen. You seem to be understanding the term driven by in Claim 10 as meaning something on the order of conveying, like an emitter of a transistor somehow conveying the differential amplifier output. But I would think there's another way of understanding driven by, and that's something like generated by, where the emitter of the transistor, as claimed, is generating the differential amplifier output. And if you understand driven by in that way, it makes eminent sense why the emitter of the transistor would necessarily be part of the differential amplifier in order to generate the differential amplifier's output. And then when you look at the specification and the way it talks about the emitters of transistors 123 and 132 of the differential amplifier providing that output, it starts to make sense to me at least why you would think that driven by, as used in Claim 10, would be really best understood as meaning generated by. Just as the emitters disclosed in the specification are generating the differential amplifier's output. So in that sense, can you explain what's wrong about that thinking for me? Certainly, Your Honor. The patent makes clear, and the unroboted expert testimony, is that the generation of the output is separate from the driving of the output, and that there are different circuit elements that are performing each function. I think to understand this, it's very helpful to compare Figure 2 of the 274 patent, which is at Appendix 207, and Figure 15 of Tachibana, which is among other places at page 10 of our opening brief, and to do so by reference to Dr. Baker's explanation of how these circuits work, which again is unroboted expert testimony. So you have a first pair of transistors. In Figure 2 of the 274 patent, that's transistors 127 and 131. And in Figure 15 of Tachibana, it's transistors 126 and 127. Those are the transistors that generate the differential output, and that's the output of the differential amplifier. What happens next is that that output goes to another transistor. In the 274 patent, that's transistor 123, and in Figure 15 of Tachibana, that's transistor 131. And then those transistors act as emitter followers. This is described in the patent at the top of Column 5 on Appendix 210. This is where the top of Column 5 says transistors 123 and 132 function as emitter followers and provide the output of differential amplifier 100, right? That's right. And Dr. Baker's unroboted testimony is that that's also what transistor 131 is doing in Tachibana. It's acting as an emitter follower, taking the differential output that was generated by the other pair of transistors and providing it to the circuitry that will perform the level conversion. And so whether you think about this as a matter of claim construction or a matter of anticipation, there's no dispute here that these two circuits are operating the same way and the board just got it wrong. And that's also true for claim 2, right? Claim 2 in the 274 patent requires a clock delay circuit. And here, too, the 274 patent shows one embodiment, and Tachibana's embodiment works the same way. They both create delayed versions of their input signals, and they output them as clock signals that will enable and disable the differential amplifier. And that's what both experts agreed was the plain meaning of that claim term. Well, let's assume for the moment that I disagree with you that the expert of the patent owner agreed with your expert that clock delay circuit has a plain, well-defined meaning outside the context of this patent. I know you were emphasizing that heavily in your brief. What evidence do you have in the record to point to that clock delay circuit, as that term is used in claim 2, has a plain and ordinary meaning? We certainly have the evidence of our expert, Dr. Baker, which is most clearly at Appendix 1901. Right. I saw 1901, and it's just a very quick, conclusory drive-by statement that your expert makes, that, in his opinion, a circuit that is designed to delay a clock signal in some manner. And I guess what I'm wondering is why is that so clear that that's the plain and ordinary meaning? Because it's not so clear to me that there was some pre-established meaning of clock delay circuit. It's not a term of art or anything like that, is it? It's not a term of art, but what it is, it's very simple, straightforward, and candidly broad claim language. And that's what North Star's expert agreed that this has a very broad meaning. That's at Appendix 1944. Let's assume for the moment that, you know, I disagree with you that the patent owner's expert conceded to what you say he conceded to. So let's just focus on what you've got going for your side from your expert, is this one sentence, this one assertion that's not backed up by anything. Is that right? I mean, I think that's pretty typical when an expert is opining, and it's different here only because normally you would have something in the specification that uses the language, and here, of course, we don't. There's nothing in the patent. The only time the patent uses the term clock delay circuit is in Claim 2. And so the patent seems to presume that people will know what that means, and I don't think it's then surprising that the expert would say, yeah, it's a circuit that delays a clock signal. Even if we were to go down this road with you and try to imagine what clock delay circuit means in some ordinary sense outside the context of the patent, why wouldn't it necessarily, why wouldn't the best guess be you take an actual clock signal from a clock, and then you add some delay to it? And that's a clock delay circuit. That's what clock delay circuit does. So I agree with your honor to the extent you're saying that the meaning is add some delay to a clock signal. What's important to remember is that clock signal is being used in a particular way in this patent. We have a construction of that term from the board that Northstar does not dispute. This is Appendix 41. The board construes a clock signal as a control signal that enables or disables a circuit element. So that's what's required in this patent. That's what the timing circuit, the clock delay circuit, has to delay. And that's exactly what Tachi Bana showed. And when you, this 274 patent, it discloses really two embodiments, one with a timing circuit and one without a timing circuit, right? No, the timing circuit is required by the 274 patent. Okay. I see him into my rebuttal. I'm happy to answer further questions, or I'll reserve my time. Well, we'll see. Judge Chen, do you wish to pursue this point a little further? No, thanks. Let me ask one question. This is Judge Lynn. Yeah. The only context I can find for the meaning of clock delay circuit in the 274 patent is the description in Figure 2 of the timing circuit, which is a circuit having a clock signal input from which two versions of the clock signal are output, one delayed and one are not. Am I missing something? So that is not described as a clock delay circuit. And, in fact, that's depicted as a timing circuit. If you take what the board found, the board thought that this was not the embodiment showing a clock delay circuit. They said that the Figure 2 embodiment is rather the specific circuit that's claimed separately in dependent claim 13. And I would point your honor to Column 5 of the specification in which, with reference to Figure 2, it repeatedly states this is one embodiment of the present invention and that the two clock signals are not required in the present invention. All right. Fine. Thank you. That's very helpful. Thank you. Okay. Now, we'll save you rebuttal time, and let's hear from the other side. Mr. Flynn. Good morning, Your Honors. I will start with, in reverse order of what my colleague argued, I will start with Claim 2. And I will start, first of all, with the part of the board's construction that requires that the clock delay circuit receive a clock signal. And I agree. I believe it was you, Judge Chen, who was suggesting the clock delay circuit is not some term of art, nor that it would have, by itself, a plain and ordinary meaning. And it is, therefore, necessary to resort to the specification for a person of ordinary skill to have understood what that term, clock delay circuit, means. To the extent that anything can be gleaned from the claim language itself, though, a clock delay circuit suggests that it is a circuit, and I don't think that this is disputed by my colleague, it is a circuit that delays a clock, meaning that a clock has to be put into it. It's not a clock generation circuit that simply generates a clock signal. It is a clock delay circuit, meaning that it delays a clock signal, and you can't delay a clock signal unless it is a clock signal that is input into the circuit. The specification confirms that that's what was meant by clock delay circuit, that a clock delay circuit has to receive a clock signal as an input. And the board correctly found, this is at page 42 of its final written decision, that the parties did agree that clock delay circuit receives a clock signal as an input. And they agreed by, just as Northstar suggests is necessary, by looking to the specification. And so, for example, in the petition, this is appendix, page 266, Micron acknowledged that although the patent does not define clock delay circuit, the only embodiment of a clock delay circuit described in the specification has a clock signal as an input. And Micron's expert, Dr. Baker, in support of that petition, said the same thing. He also said, Dr. Baker, that, and this is in his declaration at appendix 1023, that like the 274 patent, Toshibana generates clock signals by passing them, meaning the clock signals, through inverters and other intervening logic gates. And then he came back in his reply declaration, although he was now advocating a broader construction, but even in his reply declaration, he makes crystal clear in his opinion that a clock delay circuit is a circuit designed to delay a clock signal. The only way you can be designed to delay a clock signal is if the clock signal is input to it. So, now as to, that's the first part of the board's construction, as to whether or not the clock delay circuit has to receive a clock as an input. As to the portion of the construction that requires two different versions, with one version, two different versions of the input signal, with one version delayed compared to the other version, the board's construction does not, as Micron would argue, limit the clock delay circuit to the specific embodiment described in figure two of the specification. To the contrary, the board rejected Northstar's proposed construction that construed clock delay circuit to not only provide two different versions of the input, but also to provide the particular delay that is described in figure two. The board said that was limited to the specific embodiment of figure two and improperly limits the scope of the claim. But that doesn't mean that you abandon the specification altogether, and the board did not abandon the specification altogether. Under Phillips, you never abandon the specification. And in looking to the entirety of the specification, the board said, understanding how the circuit works, and understanding the purpose of the invention, that although it doesn't have to be delayed precisely in the way shown in figure two, the output of the clock delay circuit does have to be two different versions of the input that are in some way delayed compared to one another. And contrary to Micron's argument, the board did provide affirmative rationale in support of that construction. It pointed to the specification that talked specifically about the advantages and the need for the different versions, one delayed with one another. It is specifically by that kind of an output that the circuit selectively enables and disables the differential amplifier and the level converter. That was explained by Dr. Khatri, and that testimony was unrebutted. It is that kind of output that allows the selective enablement of the circuit components that allows a reduction in power consumption and allows increased speed. And the board understood that output of these two different versions of the input that are delayed in some way, it avoids the timing relationship problems that result from or can result from variations in manufacturing processes and temperatures and power supply voltage. Councilman Jess Chen, just getting to that point, my understanding of reading this patent disclosure was the purpose of this patented invention is to avoid the problems of using two separate clocks and using just a single clock, but then providing circuitry that can produce two different clock signals that are different versions of each other from that single clock to overcome the problems of using two clocks. Is that right? Yes, that's exactly right. When we're talking about the timing relationship, the advantage of being able to use a single clock as an input into the circuit that then outputs two versions of that clock, that avoids the timing relationship problems that would result if you were using separate clocks to time the system. Your opposing counsel raised the question about how to understand clock delay circuit based on how the board construed clock signal, which is, I think, something to do with some kind of control signal that enables, disables either a differential amplifier or a level converter. And in your disclosure, the clock signal 78 that's getting inputted into your disclosed timing circuit is not the actual control signal that's enabling or disabling the differential amplifier or level converter in that disclosed embodiment. So is there an inconsistency there between how the board construed clock signal and how that lines up with your disclosure? No, Your Honor, because the output of the clock delay circuit in the 274 patent are two different versions of that same clock signal. So clock 78 goes in, and what comes out are just two different versions of that same clock. They are both inverted, and one of them is delayed from the other. But they are both versions of that clock 78. They are not entirely new signals from clock 78. So it is not inconsistent. It is the versions of clock 78 that selectively enable and disable the differential amplifier and the level converter. Now, Ms. Boswick had also suggested, at least in their brief, and I suggest, I suspect I will hear about this somewhat in rebuttal, that it was the purpose of the clock-free latch, as stated in the 274 patent, to avoid these timing relationship problems. And it is true that the clock-free latch, which also obviates the need for separate clocks to clock the latch, helped to avoid those timing relationship problems. And that is described as one of the advantages of the 274 patent. But it is not the only advantage. It is not the only purpose. And it is not the only thing that avoids those timing relationship problems. Having two different versions of the input clock signal to selectively enable and disable the circuit elements, that, too, adds to the advantage of being able to avoid the timing relationship problems. And all of the advantages that the Board pointed to in its decision are directly from the patent. So the specification does indeed explain that all of these advantages of avoiding timing relationship problems, increasing speed, reducing power consumption, that was all spelled out in the specification and specifically tied into the clock delay circuit limitation. Could you get to Claim 10 and the driven time limitation? Yes. In Claim 10, it is correct that the Claim 10 of the 274 patent is talking about a signal that is driven by a signal that is generated by. It is not simply passing through. It's not simply conveying. And that's what Micron has described the bipolar transistor 131 to do, simply to receive the output of the differential amplifier in Toshibana and to pass it on to the level converter in Toshibana. But the 274 patent makes clear that that driving transistor, first of all, has to be within the differential amplifier. Your emitter followers, 123 and 132, in your spec, are they generating anything? Are they driving anything? They are. If you will see in Figure 2, there is the relationship, as shown in that Figure 2, 123 and 132, 127 and 131. So to the extent that there is disclosure in the 274 specification, those transistors are working together to ultimately provide the output of the differential amplifier to the level converter. And it is shown in Figure 2 and described in the 274 specification that it is the emitter of bipolar transistors 123 and 132 that drive those outputs to the level converter. Mr. Flynn? Yes. This is Judge Lynn. Does the emitter, does transistor 131 of Toshibana function as an emitter follower in the same sense? It acts and is described as an emitter follower, but what is not described in Toshibana is that it be part of the differential amplifier. In fact, Toshibana expressly discloses that it is part of the level converter. Those are just labels. Isn't it more important that we focus on how these components function in assessing whether the claim language is met? Well, to some extent you look at how the circuit functions, but you also do have to look at how the prior art reference, the 102 reference that they're relying on for anticipation, how it discloses those elements. You know, because they have to rely on the four corners of the prior art reference document to anticipate. And so it is important to understand how Toshibana discloses what they say is the element that meets the claim limitation. And Toshibana clearly says that it's not part of the differential amplifier. Moreover, there's not really much disclosure in Toshibana as to what bipolar transistor 131 does, other than to convey the output to the level converter or to receive the output of the differential amplifier and convey it to the rest of the level converter. There's not the same kind of disclosure in Toshibana as there is in 274 as to how transistors 123 and 132 work together with 127 and 131. So without that kind of disclosure, it is Micron's burden to prove the anticipation. Without that kind of disclosure, they can't meet that burden, and particularly so when Toshibana describes it as being part of a level converter rather than a differential amplifier. Well, let me just ask a quick question relative to this point, because what seems to be the problem is that we have claim limitations which on their face seem to be stated quite broadly until you go through the specification and the details and the kind of discussion we're having here and decide no, it really needs to be limited because. And then we have the prior art, we have the disclosure, and so on. Was there any proposal during this procedure to amend the claims to limit the definition of these two limitations and claims 2 and 10 to include the limitations that the board gave to them? No, Your Honor. There was no attempt to amend any of the claims. And, again, I think that the board recognized that the claim language in both 2 and 10, the way that the board construed those claim limitations was adequately supported by the disclosure of the specification. And with respect to the driven by, particularly, the board looked to all the different various aspects of the 274 specification that revealed what the patentee meant when it talked about driving by or driven by and disclosed the various circuit elements where one drove the output of that element to another element and the driving component was always located. So, and, again, as we argued in our brief, in their brief, or initially in their petition, they altered the disclosure of TASHA BANA to show bipolar transistor 131 within the differential amplifier and that could have only been as an acknowledgement that under the claim as properly construed, that driving transistor had to be part of the differential amplifier. Okay. Thank you. I know that you have a cross appeal that we haven't gotten to. For the cross appeal, will you then rest on the briefs? Yes, Your Honor. We will rest on the briefs for the cross appeal. Okay. All right. Then let's, for rebuttal, let's hear from Ms. Bostwick. Thank you, Your Honor. I want to focus on claim two. We continue to believe that the board's construction was wrong. The arguments are in the briefs. But if the court agrees with the board's construction, then there's still no substantial evidentiary support for its finding of no anticipation by TASHA BANA. I want to take the two parts of the board's construction, first the input, then the output. The input has to be a clock signal. And, again, I want to remind the court that the board's unchallenged construction of a clock signal in this patent is a control signal that enables or disables a circuit element such as the differential amplifier. Now, Judge Chen, you pointed to clock 78 in figure two, and that's exactly the right place to focus, because TASHA BANA's input signals to the timing circuit are as much a clock signal as the input in the 274 patent's embodiment. Figure two, clock signal 78 does not itself directly enable or disable the differential amplifier or anything else. It gets processed through the inverters and, in the case of the second version of it, a NAND gate before it goes on to do so. In figures eight and nine of TASHA BANA, which are the timing circuit, the inputs are combinations of address signals and others. It is undisputed that all that those signals are doing is to become the signals that will enable and disable TASHA BANA's differential amplifier. Just like in the 274 patent, those signals get processed through logic gates before they do that, but the board cited no basis for finding that the patent's input signal is a clock signal and TASHA BANA's aren't, other than the labels given to those signals. The fact that they get manipulated through different logic gates, it happens in both just the same, and Mr. Flynn has no basis for saying, well, it's the same signal in figure two of the 274 patent, and it's a different signal in TASHA BANA. As to the output, that the two clock signal outputs are delayed with respect to one another, the board found, and it is undisputed, that the outputs of TASHA BANA's timing circuits, including signals 19 and 21, are clock signals. That's at appendix 50. The board also found that clock signals 19 and 21 in TASHA BANA are delayed with respect to one another. It then says without citation that this doesn't make them different versions of each other, but again, they don't have to be different versions of each other, they have to be delayed with respect to one another under the board's construction, and they have to be... Well, what if I understand the board's construction as delayed versions, of the same input signal? So they are both of... TASHA BANA teaches that? The same input signal? Now TASHA BANA is outputting two signals that will be used as clock signals in which those two output signals are both a different version of the same input signal? If you're talking about the exact same signal, no, but that's not required by the board's construction, and there's no basis for imposing that limitation. At this point, we are purely talking about an embodiment that the 274 patent specification repeatedly says is not required in the present invention, but even within that world, the clock signal outputs of TASHA BANA's timing circuit are all combinations of the same group of input signals, again, whose only function is to be used to create these output clock signals, and they are delayed with respect to one another. Okay, any more questions from the panel? No, thank you.  Oh, okay. Thank you, Your Honor. All right, thanks to counsel. The case is taken under submission. Thank you, Your Honor.